445 A.2d 499

Arden E. MELZER

v.

Lynn L. Melzer WITSBERGER.

Appeal of Arden E. MELZER at No. 163.

Appeal of Lynn L. Melzer WITSBERGER at No. 210.

Superior Court of Pennsylvania.

Argued Sept. 29, 1981.

Filed Feb. 5, 1982.

Reargument Denied May 27, 1982.

154

Harry J. Cancelmi, Jr., Waynesburg, for Melzer.

James H. McCune, Washington, for Witsberger.

Before CAVANAUGH, MONTEMURO and VAN der VOORT, JJ.

MONTEMURO, Judge:

The instant action began as a Complaint and Petition for Custody of two children, Andrea and Ethan. The petition was filed by the father on January 22, 1980, in the Court of Common Pleas of Greene County, Pennsylvania.

An action in the same matter had been filed previously by the mother in her own jurisdiction of Ohio County, West

Virginia, on January 11, 1980. On January 23, 1980, after a hearing with both parents represented, the father appearing specially to contest jurisdiction, the West Virginia Circuit Court awarded custody to the mother.

The Pennsylvania Court, in response to the January 22, 1980, filing in this state, scheduled a custody hearing, and, upon Preliminary Objection of the mother, scheduled another hearing for February 22, 1980, to determine jurisdiction in the matter.

During the lunch break at this hearing, the parents appeared to be able to resolve their differences, and an Agreed Order was issued under the aegis of the Greene County Court, providing for custody that in essence gave each parent primary custody in alternate years. This Agreed Order was altered by stipulation of the parties on March 7, 1980. The issue of support was retained in Greene County by stipulation and was to be decided by the court if the parents were unable to agree.

In June, the parents were again specifically ordered to discuss the question of support. However, before that issue was resolved, either privately or before the court, the father, on July 16, 1980, petitioned again for custody.

The court interviewed the children on July 23, 1980, with attorneys for both parents present, and then scheduled a full hearing upon receipt of the mother's Petition for Custody. This hearing was held on August 14, 1980.

The matter was fully litigated, and the lower court weighed the complex matters concerning the best interests of the children.

The order of the court resulting from the decision of the trial judge on the record below determined that Greene County did have jurisdiction to decide the matter and gave custody to the father. Additionally, the order awarded certain child support sums to the mother about which there is no discussion in the record. Both parents appealed from

the order; the mother appealed from the finding of jurisdiction and determination of custody; the father appealed from the support award.

This court affirms the finding of the court below as to its exercise of jurisdiction, although by a different process of reasoning. We also affirm the award of primary custody to the father as determined by the discretion of the lower court. As to the support, the order is vacated as of date of filing of this opinion, without prejudice to the mother's right to apply to the court of Greene County for whatever relief in the way of child support she may, in fact, require and prove.

## FACTUAL HISTORY

The parties to this action resided in Greene County together from 1972 until 1976. In the spring of 1976 the father left the marital home and lived in neighboring Allegheny County while the mother and children remained in the family home. In August of 1978, the mother and children moved to West Virginia, and the father moved back into the residence in Greene County.

The children had been in the custody of their mother since 1976, and remained in her custody in West Virginia from August of 1978 until January 1980. At this time, the father informed the mother by telephone after a visitation that he would not return the children as previously had been their custom.

The mother made one abortive foray into Greene County to physically recover the children, and then promptly filed suit in the West Virginia Circuit Court. The father appeared specially to contest jurisdiction. The case was heard and a preliminary injunction and preliminary determination were issued by that court in favor of the mother. Appeal was filed, and proceedings in West Virginia were stayed as of February 19, 1980.

The instant action was by that date scheduled in Pennsylvania, and the mother in her turn appeared specially to contest jurisdiction. The hearing was begun, but no determination was made at that time because over luncheon break the parties discussed possible compromise, and in the afternoon the parents stipulated to an Agreement which appeared to settle the matter.

This Agreed Order was an elaborate document which unarguably modified the orders of the West Virginia court as well as the informal established custody arrangements observed by the parents prior to January 1980. By its terms, this Order defined itself as a settlement of the outstanding actions in West Virginia and provided for their discontinuance. The Order stated itself to be:

> . . . a full settlement of all issues, cases and proceedings pending in this court and in this Commonwealth and in the Court of Ohio County and in the State of West Virginia . . . ,

and it specifically reserved the support issues still outstanding to its own jurisdiction.

The above Order was thereafter modified by Order of March 7, 1980, which was also agreed to by stipulation of the parties and provided in pertinent part:

> All disputes pertaining to the enforcement, modification, or other proceedings about the custody of Andrea or Ethan _____, visitation rights, support, or determination as to the proper venue of such proceedings, shall be submitted to the Greene County Court in (and under the laws of) the Commonwealth of Pennsylvania.

There is an Order of June 2, 1980, on the record which orders the parties to proceed to discussion on child support, but no further information as to this collateral issue appears.

Thereafter, on July 15, 1980, the father petitioned again for primary custody of the children, alleging that the joint custody agreed to on February 22, 1980, was not in the best interests of the children because the children were opposed

to the arrangement and because the mother was not careful of their health and safety.

The court did not automatically grant a hearing on the matter, but interviewed the children with counsel present on July 23, 1980.

At this time, Ethan was nine and a half years old and Andrea was fourteen and a half. Ethan definitely preferred to live with his father because:

> ... I am used to living here. It's fun. I think the school is better because we work and think more. It's just a good school.
>
> .     .     .     .     .
>
> This school is lots better than any other school. (R. N.T. 55a)

He also did not like his mother's residence because his older stepbrother always picked on him and teased him.

Andrea was more fluent in expressing her preference. She "shares the same views" with her father and found her stepmother (whose own children are grown and gone from the household) far easier to live with than her step-relatives on her mother's side. She, too, felt harassed by the older stepbrother and was obviously made nervous and uncomfortable by the stormy relationship between her stepfather and his son.

Their father is a professor who schedules his classes to have time at home, and his wife is also usually home. He prepares breakfast before the children leave for school. If Andrea is ill, there is someone in the house and an immediate check-up with the doctor is provided. In contrast, her mother works full-time and so does her stepfather. If Andrea is ill, she is home alone, and her mother tends to put off visits to the doctor. She makes her own breakfast. The school in Pennsylvania is better and she has more friends there. She would not actually run away from her mother's home, but she thinks about it. She does believe that both parents love her. (R. N.T. 62a–71a).

After these interviews with the children the trial judge directed counsel for the mother to file her Petition for Custody and scheduled a full hearing on the merits. At the hearing on August 14, 1980, the extraordinarily antagonistic behavior of both parents became apparent. There was no doubt in the mind of the trial judge and, upon review of the record, none in the mind of this court, that the sight of these two professional parents battering doors, brandishing guns, calling police, withholding clothing, and otherwise misbehaving was, to say the least, detrimental to these children.

The counsel for the mother orally requested in court that the case be dismissed on grounds that testimony did not indicate "any substantial change" since the Agreed Order of February 22, 1980. (R. N.T. 86a). The court replied at some length:

> ... Sometimes someone needs to say something totally objective ... I sit here and I listen to these types of cases and I keep wondering is human intelligence guiding us to human reason or is this the land again of the barbarians... Whether it is this court or the Circuit Court in Ohio County ... it is so immaterial to this court. What is material to this court is that the more of this I hear, finally I know these children need a comforting shelter of some objective judgment ... not invaded by whim or fancy on the part of either parent.... these are well above average parents, but this circumstance they are creating ... and I presume unintentionally on their part, but it ... cannot be continued ... even as I say that, I think of the overwhelming effort both parents have made but those efforts are not resulting in a proper uniform good for these children. (R. N.T. 87a–88a).

The hearing continued, and the order resulting therefrom was a decision accepting jurisdiction, giving custody to the father and visitation to the mother, and allowing $100 per month in child support from father to mother, with an additional $200 of support due in the two months in which

mother had lengthy visitation. We affirm the order of custody and vacate the order for support.

## DISCUSSION

Under § 5344(a)(1)(i) of the Child Custody Jurisdiction Act, "home" jurisdiction predominates under ordinary circumstances. This jurisdiction is defined by the Act as:

The state in which the child immediately preceding the time involved lived . . . with a parent . . . for at least six consecutive months . . . 42 Pa.C.S.A. § 5343.

The children were living with their mother at the West Virginia address for well over six months prior to the decision of the father to retain them in Pennsylvania after their visitation. West Virginia qualifies as the state of "home" jurisdiction.

The father's behavior in unilaterally retaining the children against prior custom of the parties was behavior proscribed by the Act. Section 5349(a) discusses the "general rule" where an "initial decree" is concerned. ("Initial decree" is the "first custody decree concerning a particular child." § 5343). No court order had been entered at that date concerning these children. Therefore, § 5349(a) applies:

If the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in conduct intending to benefit his position in a custody hearing, the court may decline to exercise jurisdiction if this is just and proper under the circumstances.

The drafters of the Uniform Act, from which the Pennsylvania provisions were adopted almost verbatim, were careful to warn courts not to accept jurisdiction too easily under § 5344(a)(2), the "significant contacts" jurisdictional base. It is to be read "in the spirit of the legislative purposes" which promote cooperation with other court systems in order to discourage unending parental squabbles and the unilateral removals of children which have proved so harmful in the past. 42 Pa.C.S.A. 5342.

At the time the father filed this action in Pennsylvania, therefore, an action had already been filed on the preferred jurisdictional base in West Virginia, and the father's self-help in unilaterally deciding to retain the children would have been additional reason for the Greene County Court to decline to accept its possible jurisdiction under § 5344(a)(2), despite its significant contacts with the children.

However, once the case had been filed, the lower court was correct in scheduling a hearing to determine its own jurisdiction in the matter, and it was during the pendency of this litigation as to jurisdiction that the parties came to an agreement between themselves which was accepted by the court below. As noted above, the wording provided that this was to be a "full settlement" of *every* issue pending in Ohio County as well as in Greene County. Also, as mentioned *supra*, an addendum to the February order was stipulated to and made a part of that order as of March 7, 1980. This wording *specifically* provided that "all" disputes as to enforcement or modification of proceedings pertaining to custody of these particular children were to be submitted to the Court of Greene County, Pennsylvania.

Curiously, the opinion of the lower court does not stress the free agreement of the parties to a valid and reasonable jurisdiction, but appears to base its assumption of jurisdiction largely upon the significant contacts the children had with Greene County. The wording of the lower court is misleading when it states that:

> . . . it is not now a matter of which court case was first filed, or where the first order of custody was made, it is only a question of whether the plaintiff in this action has satisfied the requirements of the above section of the Act? [Meaning the "significant contacts" section.]

As seen, *supra*, the "Significant Contacts" provision is the *alternative* provision to the preferred "home" jurisdiction and is to be very strictly limited in its construction. Especially where the non-custodial parent has resorted to self-

help before approaching the court, refusal of the trial judge to exercise jurisdiction under § 5344(a)(2) would ordinarily be proper.

■ The Greene County jurisdiction *was proper in this instance under § 5344(a)(2) because the parties agreed to its exercise in lieu of another jurisdiction which was also valid under § 5344(a)(1).* Once the parties selected this forum, there was no onus on the Pennsylvania court to consider whether it should, under all the circumstances, decline to exercise jurisdiction.

This was not an ancient agreement, nor was it entered into by either parent in ignorance of the bitterness of the battle in which they were joined. The addendum specifically providing for the forum of parental choice was, in fact, entered into *after* the original Agreed Order had already begun to fail and *after* the mother had knowledge that the alternating-years of custody arrangement was not acceptable to the children.

The trial judge, faced with a situation in which the parties had agreed upon jurisdiction, but proved incapable of agreement on anything else, found himself with three nominal routes to follow: (1) he could refuse to act and return the case to West Virginia; however, in the face of the recent agreement as to forum, this gesture would have been futile as it would have given rise to a valid appeal; (2) he could accept jurisdiction but refuse to intervene in the agreed custody; however, this course was also futile, since the order had already begun to need patching, and the still-open support matter was also apparently unsolvable by private agreement; or (3) he could accept the whole unenviable job, acknowledge his jurisdiction, and fulfill the letter and the spirit of the Custody Act and the custody case law of this Commonwealth by making a full court adjudication of the best interests of the children. This, in the exercise of his discretion, he elected to do, and we believe he chose the proper course.

The most readily accepted indicia of "changed circumstances" justifying modification of an existing order are lacking here. The housing, schooling, marital status, and incomes of the parents did not change materially in the few months between the original Agreed Order and the modification order entered by the trial judge after full hearing on the matters involved.

What did change materially was the hope of the court, and the parties as well, that *any* agreement as to custody would be accepted and adhered to by these parents and these children. In view of the working, if not truly amicable, arrangements in force from 1976 to 1980, the court was justifiably optimistic that the matter could be privately settled. The ensuing months made it abundantly clear that this would not be the case. This court cannot but agree with the trial judge that these intelligent and well-intentioned parents were approaching "the land again of the barbarians." Jurisdiction lay with this court. For the judge to decline to take action for lack of conventional grounds of "changed circumstances" would, under the facts of this particular case, have been an abuse of discretion.

■ The abiding theme of the Custody Act is that stability of environment for children is vital, that shifting, conflicting custody is harmful. See *inter alia* § 5342, 5348, 5349. It is likewise hornbook law that the ultimate aim of custody proceedings is a determination of the child's best interest, physically, intellectually, morally, and spiritually. See, e.g., *In re Davis*, 237 Pa.Super. 516, 352 A.2d 78 (1975); *Commonwealth ex rel. Bordlemay v. Bordlemay*, 201 Pa.Super. 435, 193 A.2d 845 (1963).

■ The trial judge took careful account of the children's preference and examined with care the other evidence offered by both parties. He found both parents fit and proper. He found the atmosphere of country life and surroundings familiar to the children from babyhood more conducive to the welfare of this particular pair of children.

He found the father's more easy-going approach to life to be temperamentally more comfortable for the children, but also found that the father did not lack discipline.

The judge declined to find one school system intrinsically better than the other, but noted that the children were far more comfortable in the Pennsylvania schools. He also weighed the advantages of a well-liked stepmother at the father's residence versus the disadvantages of a disruptive step-relative relationship in the mother's residence. He also noted easier "discourse" with the father, and the odd, but true fact, that the children's friendships in a rural setting outnumbered those in the urban location.

We have thoroughly reviewed the entire record and find that it supports these findings. The award of primary custody to the father and liberal visitation to the mother was well within the lower court's discretion and we affirm.

■ There are, however, no facts set forth in this record to give credence to the provision for support adjudicated as part of the order of August 20, 1980. Support was at various times included in this record as a matter in controversy, and certainly the jurisdiction of the lower court extended to support matters. This was specifically provided for in the Agreed Order of February 22, 1980. Although the court below ordered the parties to discuss support by its order of June 2, 1980, no further information on the matter appears. The trial judge may have had informal knowledge as to this matter, but in view of the lack of evidence as to need and ability to pay, we must vacate the provisions of the order of the court below without prejudice to the right of the mother to apply to the Court of Greene County for whatever relief she may, in fact, require during her periods of visitation with the children.

Order affirmed as to custody of children.

Order vacated as to support from date of filing of this opinion.